Good morning, Your Honors. My name is Sean Sedegat. May it please the Court. This case has had a story past. We've had two trials at the IJ level, three appeals to the Board of Immigration Appeals, three petitions for review, and now two oral arguments. At the last oral argument, the Court remanded the case back to the BIA with the instructions that they need to analyze the four events that took place in this case, because they had scant review previously. They had only a one-liner. What is more striking is that Judge Berzon, concurring with that opinion, actually wrote a memorandum separately and said what they need to do, what they need to analyze. She stated that in this case, the threats directed at the respondent's children, it was by the Mafia, a group that we know carries out certain threats. The threats were delivered in person, in close confrontation, in close proximity to the individual, and they were coupled by the Mafia relative who had warned them that you better leave the country, otherwise things are going to happen to you. Despite all of that, I believe the BIA hasn't carried out its directive. They have seemingly analyzed only two out of the four incidents. They actually say so in their appeal, and they lay this at our doorstep, saying that we had only raised two of these issues, which is not true. At page 10 of the 2006 appeal brief that our office wrote, it actually lays out the fear out of the four incidents. That's page 269 of the record of proceedings. They have seemingly failed, once again, to articulate the cumulative effect of these. If your honors look at the previous BIA decision, they used the word cumulative. So having used it once, we have to understand that they know the meaning of the word cumulative and the weight of it, but they haven't used that word in this case, and it doesn't look if they have only analyzed two out of the four incidents, they couldn't have looked at this cumulatively. And finally, they have failed to look at this case with the particulars of it involved, the particulars that Judge Berzon laid out for them. They once again seem to basically brush off the entire case by saying that more evidence was not provided. We believe that ample evidence was provided in this case. Let me ask you about one of the difficulties you have in your case, and that has to do with the husband's role as a cooperator or an informant and a determination that he had not done so before fleeing. Why isn't that fatal under the legal construct here? Your Honor, the issue is not whether the threats would have been carried out, because I think had the husband, had Mr. Bovo cooperated, and we don't know if he has or not, we just know that frozen in time at the end of the last court hearing, the answer was, I don't know. She left. Ms. Modoyan left before she knew what happened. But isn't there a determination made that there's not sufficient evidence that he did cooperate? I mean, isn't that the ultimate conclusion we're needing to deal with, that he didn't cooperate before fleeing? The determination is that we don't know, and enough evidence hasn't been given to show that it was done. Yes, I agree with you. But that's not the issue. The issue is, were the threats enough at the time that they were uttered to raise fear sufficient for past persecution in the person who heard it? We have to understand, this is a mafia, a group that is strong enough, Your Honors, and the disparity in who they are and who the listener is, the fact that they have used the weaknesses of Ms. Modoyan, the children, to utter it, and they have held out this prospect of harm that will come to her if an intervening cause happens, which she has no control over. The fact of her helplessness, the fact that they have given her these choices that she has no control on, I think rises to the level of fear that would be past persecution. We don't need... I agree with this issue of verbal threats versus physical harm, and the Lim case, which I know you're familiar with, it's been cited in the briefs, teaches us that really it's in only a very small percentage of cases where we've elevated the verbal threats to constitute past persecution. How does your case fit into the Lim case, and whether or not you think there, it really is not a mine run case, and that it actually is a unique situation that we should really distinguish from Lim in some way? Your Honor, I use the immigration outline that's on the Ninth Circuit's website almost on a daily basis. I'm glad to hear that. We do too. It's very useful. There are 38 cases that deal with threats, so that tells me the court doesn't have problems defining threat. It's just difficult to define it because in each case it's different. Each case needs to be analyzed on its own merits. You haven't had a case like this. I've read all the 38 cases, and there is nothing where the disparity in the person or the group that wants to perpetrate the harm and the person who hears it, the perpetrator, this case, actually did have physical manifestations of the verbal harm. She says, I was shocked with fear. I looked so bad that my neighbor said, you don't look well. There are instances where the fear manifested itself in physical harm as well, but we don't need it. The fact that it was done in close proximity, the fact that it used her weaknesses, the children, the fact that she had actually no control over what's going to happen because Mr. Bovo being in jail was facing a number of years of imprisonment, he had decided already to do this. All of these together rise up to the level that, although it's not like limb, it's a case by itself that could fit among those 38. We have enough in this case to rise to the level of fear. Remind me why you think the threats that you have documented in the record amount to persecution. Your Honor, she says I was so frightened that I took my child out of the car seat, held him tightly in my arms and stayed there for 15 to 20 minutes. I was so shaken I couldn't move. Then she says I was in a state of fear. Then she says I was frozen by shock and fear. These are different incidents, not in one incident because we had four incidents here. My husband was so scared that he said, you better leave Italy until you and the children remain here. You're in grave danger. She says I was becoming scared of my own shadow. I felt for myself and my children. We were in danger. I was especially afraid and worried for the children that mafia could do something to them. I imagined that they could find us and kill us. I don't think anybody who has children would disagree with the notion that possible harm to one's children is probably the biggest thing. Your Honor, remind me of the time period between the last threat and her departure. Your Honor, it was almost immediate. I believe it was within a couple of months, but I'm not sure about that fact. Would you like to reserve your time? Yes, Your Honor. Thank you. Morning again, Your Honor. It's Eric Anderson representing the Attorney General. Ms. Midoyan suffered no physical harm in Italy before she came to the United States. The four threats that she received did not rise to the level of past persecution. Why not? The board provided a fulsome explanation in response to the court treatment. Three things it pointed out. First, the threats were vague and not explicit. The cases where this court has found threats were persecution involved explicit threats of death. That's not how the mafia operates. Help me understand what was going on. The threats are confusing or ambiguous about these statements. They're ambiguous in the sense of they talked about, you know, say hello to your father the next time you see him. What do you think you're talking about? You think that was just a casual greeting? It's possible, Your Honor. And if it's possible, that's all we need for the addition. So not only were the threats vague and not explicit, but they were also future and conditional and not present. None of them were claiming we're going to hurt you today because of what your husband's doing or we're going to hurt your children because of something your husband has done. They were all, again, even if we take the statement, say hello to your father the next time you talk to him, the clearest example we have is a statement saying what your father is doing is wrong. Even if we take those, they're conditional. They don't present a present tense direct threat of death. And finally, there was a... Your presentation on this point is requiring us to be conspicuously naive. I'm not sure there's a question for me to respond to at that point, Your Honor. There's a fact finder here and the fact finder is the immigration judge to be reviewed by the board. What we have in the record is the clearest evidence we have is the testimony from John Agnew, the expert, who talked about what the mafia does to families of cooperating witnesses. But there is no evidence that Mr. Bovo was a cooperating witness. What we know is that up to, I think, 2007, no, he had not cooperated at that time. After 2007, we have no knowledge. We don't know where he is today. We don't have any reason to believe that any harm came to him. Without this evidence, without compelling evidence, these threats did not create a presumption of a well-founded fear of future persecution. Which is really what the past persecution comes down to, is then does the burden shift to DHS to rebut or does the burden stay with the applicant, Ms. Mudoian, to demonstrate a well-founded fear? And in the years that have passed, no harm has come... There's no evidence, I should say, of any harm that has come to Mr. Bovo. We know from Mr. Agnew that when the mafia wants to punish the family of a cooperating witness, it does so in quick succession. The only instance he had of possible exception to that rule was someone who had died under suspicious circumstances, and he couldn't really say otherwise. Given the passage of time, there is no evidence compelling a finding that Ms. Mudoian has a well-founded fear of future persecution. What's the passage of time that's relevant here? The passage of time from... It comes in two ways. The passage of time from when the threats were delivered and the passage of time, meaning the interest of the mafia in harming Mr. Bovo or his family, it may have dissipated. There's no evidence that it's continued. Right. It definitely dissipated because they left, right? Well... I mean, the difficulty we have in these cases is the following. If people are killed, then, of course, there's no opportunity to apply for asylum. So both the courts and the board are weighing the situation where there's the threat, but no death yet. And, of course, if there's death, it's fait accompli. So the notion that nobody's died or nothing has happened doesn't seem to ring true here because, of course, once they fled, then they couldn't have been killed. But Mr. Bovo didn't flee, or at least there's no evidence that he fled, and there's no evidence that any harm came to him. A family. And there's no evidence that he cooperated, even. And just another aspect of the passage of time is the first of these threats was delivered in 1997. Seven years later, Ms. Mudoian came to the United States and voluntarily returned to Italy a few months later. She was asked, well, why did you do that? If this incident was past persecution, why did you voluntarily return to this alleged fear of harm? And she explained, well, over time, you know, the threats had dissipated. So not only is it a general concept, but Ms. Mudoian testified in this case that it had occurred for her. So Your Honor, the government would simply defend that the board has provided an explanation that the court asked for in its prior remand, that the three distinctions it has pointed out support its finding that these threats were not past persecution. I'm not sure I got into the third one at all, but the fact that this court has found in cases where there has been torture and murder of immediate family members that a threat can rise to the level of persecution. There's nothing like that in this case. So the record doesn't compel a finding of past persecution, nor does it compel a finding of a well-founded fear of future persecution. And unless there are further questions, we ask for the petition for review to be denied. Would you let me ask you about a couple of propositions and see if I can get your reaction to it. We would agree that the Mafia is an organization that is notorious for its treatment of co-operators, stitches, snitches. Would you agree with that? I would say that Mr. Agnew's testimony in this case would establish that, yes. And there's swaths of Italy where the government, according to the country reports, has been ineffectual in controlling the Mafia. The reports, as I read them, indicate that the Mafia goes after itself. The Mafia groups go after itself in violent competition, motivated by the drug trade and the profits they can obtain. But yes, they have not stopped this murder between Mafia groups, yes. Okay. Thank you, Your Honor. You have some rebuttal time. Yes, Your Honor. Thank you. What do you say about the trip back? I'm not understanding, Your Honor. The government just pointed out that after she had relocated to the United States, she voluntarily went back. Yes. Well, we are not looking at any one of these incidents as the key incident. We are looking at them cumulatively. She agrees that her fears dissipated after a while, after the first incident in 99. But starting in 2005, when the husband was re-arrested and started contemplating cooperating with the government, three incidents happened within quick succession, and that rose up to the level that she felt for her life. Your Honor- When did she return? What year? I looked it up, and I wanted to let you know. She left Italy two months after the last incident, so very fast. So even if Professor Agnew believed that these things happened, the killings happened within fast succession, we shouldn't ask for her to remain there until it happens. She left within two months. But when did she voluntarily go back? She had a six-month visa here, Your Honor. Are you talking about, like, 97? Yes. She went back- 99. She came back in 99, and then she's there, but- She came in 99. She left after six months. She remained in Italy until 2006 when she came to the United States. Right. And the incidents, the last three incidents, were 2005? Correct. Starting in March of 2005, then a couple of months later, then a couple of days after that, the last incident happened. Your Honor, we've all seen Godfather. I'm going to make you an offer you can't refuse. As you said, these things are never done overtly. They're always done covertly, but in this case, it couldn't have been even more overtly than this. They tell her, it's better for you and the children if your husband doesn't cooperate. I mean, that's laying it on the line. My time seems to be over, Your Honor. Thank you very much. Thank you. Thank you both for your argument this morning. Moitian v. Barr is submitted.
judges: Parker, Farris, McKeown